UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

T.V. SESHAN, M.D., P.C.,

                                    Plaintiff,

            -against-

AETNA, INC.,

                                    Defendant.

25-CV-2938 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

The No Surprises Act ("NSA") changed the trajectory of medical billing in the United

States. In protecting patients from qualified surprise medical bills, the Act shifted the cost of

certain out-of-network services onto health care providers and insurers. Before the Court today is

whether Congress intended to create a privately enforceable remedy to accompany the NSA's

dispute resolution mechanism. In this case, like so many others around the country, a health care

provider took care of a patient insured by a private company without a network contract. When

the provider and insurer could not work out a fair cost-sharing agreement, they went to an

arbitration-like forum to determine who should pay what. The health care provider won, and the

insurer was directed to pay an award. But a 30-day statutory period passed, and the health insurer

did not pay. Now, two-and-a-half years after Plaintiff provided its services, the insurer—here,

Aetna—has only paid approximately 1% of what it owes. This case addresses what remedies, if

any, parties to Independent Dispute Resolution ("IDR") have to enforce the award rendered

therein. Ultimately, the Court finds that the NSA denies Plaintiff a remedy in federal court and

dismisses the case.

## BACKGROUND

Congress passed the No Surprises Act to prevent health care providers from sending patients surprise medical bills, often numbering in the tens of thousands of dollars, for out-of-network care they unknowingly received. "These unexpected medical bills can result in financial ruin," Congress recognized. H.R. Rep. No. 116-615, pt 1., at 52 (2020). The NSA was designed to protect privately insured patients from these unexpected costs by prohibiting "balance billing" in certain circumstances. *See* 42 U.S.C. §§ 300gg-131 to 132, 135. It requires insurers to cover emergency services at out-of-network facilities without prior authorization and certain out-of-network services at in-network facilities, and in turn, incentivizes this coverage by benchmarking rates comparable to those charged by in-network providers subject to an existing contract. 42 U.S.C. §§ 300gg-111(a)(1), (b)(1); *see also id.* § 300gg-111(a)(3)(E). In so doing, the Act set out accomplishing twin aims: protecting patients from unexpected, financially ruinous medical bills, and curtailing the rising costs of out-of-network treatment. *See* Letter from Frank Pallone and Patty Murray to Departments of Health and Human Services, Treasury, and Labor, at 1 (Oct. 20, 2021), https://www.help.senate.gov/imo/media/doc/Pallone%20Murray%20No%20Surprises%20Act%20IFR%20Comment%20Ltr%2010.20.212.pdf; *see also* NSA, Pub. L. No. 116-260, 134 Stat. 2859–60 (2020) (requiring study of the NSA's impact on "overall health care costs" and "on premiums and out-of-pocket costs").

Because the NSA shifts the cost of some out-of-network care away from patients, it created a system for health care providers and private insurers to determine fair cost sharing. After providing a qualified out-of-network service for an insured patient, the health care provider sends a bill for the cost of the medical service to the applicable insurer. The insurer responds

with an initial payment or notice of denial of payment. *See* 42 U.S.C. § 300gg-131(b)(1)(C). The provider may then, within 30 days, initiate open negotiations to seek a more desirable cost-sharing arrangement for the service or item. *Id.* § 300gg-111(c)(1)(A). Where negotiations are unsuccessful after 30 days, either party may initiate the IDR process to resolve the dispute. *Id.* § 300gg-111(c)(1)(B). The IDR process is "'baseball-style' arbitration," wherein each party submits a payment offer with supporting information, and the "IDR entity" chooses between the two offers. *Id.* § 300gg-111(c)(5)(A)–(B); H.R. Rep. No. 116-615, pt 1., at 56–57 (2020). Only certified IDR entities may determine the dispute, and the factors they may consider are carefully prescribed by the NSA and its implementing regulations. *See* 42 U.S.C. § 300gg-111(c)(5)(C)–(D).

A team of neurologists brings this action under Section 9 of the Federal Arbitration Act ("FAA") and the No Surprises Act to confirm an IDR award against health insurance company Aetna. ECF No. 1 ("Compl.") ¶¶ 5, 7, 24, 30. On September 21, 2023, Dr. Melissa Balbuena-Root provided neuromonitoring services during a surgical procedure at White Plains Hospital. *Id.* ¶ 6. No network contract governed the required payment. *Id.* ¶ 10. Plaintiff submitted a Health Insurance Claim Form to Defendant for $11,132 to cover the cost of its services, but Defendant only paid $107. *Id.* ¶¶ 8–9. Plaintiff disputed that payment determination and, following failed negotiations, initiated "arbitration." *Id.* ¶¶ 13–14. An "arbitrator" ruled in Plaintiff's favor and awarded Plaintiff $9,178 for its services. *Id.* ¶16. However, Defendant never paid, and Plaintiff brought suit. *See id.* ¶¶ 19–21.

Plaintiff brings two alternative claims in this action. First, Plaintiff seeks an order confirming the award against Defendant under 9 U.S.C. § 9 ("Section 9 of the FAA"). *Id.* ¶¶ 23–28. Second, Plaintiff brings a claim under the NSA, claiming that Defendant, by failing to make

the ordered payment within 30 days, violated the Act. *Id*. ¶¶ 29–36. Plaintiff seeks an order directing Defendant to pay the outstanding $9,071, plus attorneys' fees and costs for the instant action. *Id.* at 6. The parties dispute whether the NSA contains a private right of action and whether Plaintiff can seek relief under Section 9 of the FAA. *See* ECF No. 13 ("MCA"); ECF No. 14 ("Opp. to MCA"). Defendant also contends Plaintiff brought this action against the wrong party. Opp. to MCA at 6–7. The facts are largely undisputed in this case, leaving it ripe for the Court's determination.

## DISCUSSION

The following discussion proceeds in three parts. First, the Court analyzes whether the No Surprises Act contains an implied right of action that would enable Plaintiff to bring the present case and finds that it does not. Second, the Court determines that Plaintiff similarly cannot obtain relief under Section 9 of the FAA, because the NSA forecloses that claim. And third, the Court concludes that the parties' remaining arguments are moot in light of its prior determinations.

At the outset, the Court notes that it properly has subject matter jurisdiction in this matter—an issue that the Court asked the parties to brief. *See* ECF No. 9. Where a

> complaint "is so drawn as to seek recovery directly under the Constitution or laws of the United States," the district court must entertain the suit unless the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."

*Chenkin v. 808 Columbus LLC*, 368 F. App'x 162, 163 (2d Cir. 2010) (quoting *Bell v. Hood*, 327 U.S. 678, 681–83 (1946)). Here, even though the Court finds that the NSA does not contain a private right of action, for the reasons stated below, the genuine question under the federal laws renders jurisdiction appropriate. *See id.* To the extent the Court lacks subject matter jurisdiction

4

over the FAA claim alone, *see Badgerow v. Walters*, 142 S. Ct. 1310 (2022), supplemental jurisdiction over this claim is clearly appropriate. *See* 28 U.S.C. § 1367(a); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (finding supplemental jurisdiction where the claims at issue "derive from a common nucleus of operative fact"). And indeed, no party disputes the Court's jurisdiction here.

## I.     The No Surprises Act Does Not Contain Private Right of Action

The Court finds that the No Surprises Act does not provide any basis for a federal court to confirm an IDR award. The NSA does not expressly create a private right of action, and neither the Second Circuit nor the Supreme Court has examined whether it creates an implied private right of action. Thus, the Court conducts its own analysis of the statute. The Court's task here is interpret the NSA "to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citations omitted). Statutory intent alone is "determinative," and courts are directed to "begin (and . . . end) our search for Congress's intent with the text and structure" of the Act. *Id.* at 286, 288*; see also J.S. v. New York State Dep't of Corr. & Cmty. Supervision*, 76 F.4th 32, 38 (2d Cir. 2023) ("When interpreting a statute, we begin by giving effect to the text's plain meaning, which . . . 'draws on the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021))). Although statutory interpretation "always begins with the plain language of the statute," *Grajales v. Comm'r of Internal Revenue*, 47 F.4th 58, 62 (2d Cir. 2022) (citation omitted), the Court may use cannons of statutory construction to "supplement[] and narrow[] the possible meaning of ambiguous text," *Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001). If, after this analysis, the text remains ambiguous, the Court may then turn to legislative history and

other interpretive aids to resolve the ambiguity. *Id.* at 98; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("[C]lear evidence of congressional intent may illuminate ambiguous text.").

Here, the Court's analysis begins and ends with the statutory text, because it finds that the text unambiguously forecloses a private right of action to enforce an IDR award. Much of the instant dispute turns on the following provision:

> A determination of a certified IDR entity under subparagraph (A)—
>
> > (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and
> >
> > (II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

42 U.S.C. § 300gg-111(c)(5)(E)(i).

Congress's statement that IDR determinations "shall not be subject to judicial review" provides a clear directive that there is no private right of action under the NSA. The provision's circumscribed exceptions bolster that conclusion. The negative-implication canon, which advises that the "express mention of one thing excludes all others," is instructive here. *Georges v. United Nations*, 834 F.3d 88, 93 (2d Cir. 2016) (cleaned up). The NSA explicitly incorporates the bases for vacatur under the FAA as the only avenues for judicial review. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (barring judicial review "except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9"); 9 U.S.C. § 10(a) (enumerating the incorporated bases for vacatur, including where the award was procured by corruption or fraud, there is evidence that an arbitrator was partial or corrupt, or the arbitrators committed procedural "misconduct").

6

In incorporating only one section of the FAA and thus providing only one type of judicial review, Congress manifested an intent to preclude actions to confirm IDR awards.

Plaintiff argues that, by rendering IDR awards "binding," Congress intended to create "an implicit judicial enforcement mechanism." MCA at 8. It reasons that any other interpretation would render IDR awards "meaningless." *Id.* at 9 (quoting *Guardian Flight LLC v. Aetna Life Ins. Co.*, 789 F. Supp. 3d 214, 228 (D. Conn. 2025)). The Court disagrees. The requirement that IDR awards are "binding" is qualified by the immediately following prohibition on "judicial review." 42 U.S.C. § 300gg-111(c)(5)(E)(i). This proximity demonstrates that the two provisions must be understood together—that, although the awards are binding, judicial review is not what renders them so. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[A] word is 'given more precise content by the neighboring words with which it is associated.'" (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)).

Two further observations reinforce this interpretation of "binding." First, the statutory scheme is structured around enforcement that takes place almost exclusively outside of federal courts. The Act authorizes states and, if necessary, HHS to assume enforcement authority of the NSA. *See* 42 U.S.C. § 300gg-22(a); *see also, e.g.*, *id.* § 300gg-111(a)(2)(A)(i) (permitting states to audit insurers regarding the determination and application of the benchmark cost metric); *id.* § 300gg-111(a)(3)(H)(i), (iii) (displacing the benchmark cost metric where states have legislated a specified amount for a service); *id.* § 300gg-111(a)(3)(K)(i), (iii) (displacing the negotiation and IDR process in states that have legislated an amount for out-of-network services). The NSA's enforcement provisions explicitly empower HHS to assess penalties against insurers for failing to comply with the NSA. *Id.* § 300gg-22(b). Parties who would like to appeal an assessment may do so in front of an administrative law judge, whose decision is final unless the HHS Secretary

7

modifies or vacates it. *Id.* § 300gg-22(b)(2)(D). And the only recourse for federal court review, aside from the previously discussed vacatur provisions, is by the Attorney General when an entity has failed to pay its penalty. *Id.* § 300gg-22(b)(2)(F)(i).

Second, the "shall pay" language throughout the NSA creates the obligation that is necessary for state or administrative enforcement, and the award's "binding" nature is best understood in this context. The NSA includes language throughout that insurers must pay IDR awards. For example, near the outset, the statute requires that "the [insurance] plan or coverage . . . *shall pay* a total plan or coverage payment directly . . . to such provider furnishing such items and services . . . ." *Id.* § 300gg-111(b)(1)(D) (emphasis added); *see also id.* § 300gg-111(a)(1)(C)(iv)(II) (requiring that the insurer "shall cover" out-of-network emergency services by making "payment directly to" the provider after IDR). The timing requirements for payments also include "shall pay" language. *See id.* § 300gg-111(c)(6) (requiring that "[t]he total plan or coverage payment required . . . shall be made . . . not later than 30 days after the date on which such determination is made."). "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016)). These requirements on insurers evince a clear statutory intent for the IDR payments to be "binding" where, as here, the balance of payment owed flows from the insurer to the provider. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I).

Under the NSA, HHS is empowered to level civil penalties against insurers who violate their obligation to pay under the statute. HHS can fine insurers who fail to pay their IDR awards $100 every day for each failure to pay until compliance is rendered. *See id.* § 300gg-22(b)(2)(C)(i)–(ii). In determining the appropriate penalty, HHS can consider whether an entity

has repeatedly failed to pay its awards. *See id.* (considering an insurer's "previous record of compliance"). In this case, if HHS levied the maximum fine for failure to pay for over three months, Defendant would owe more money to HHS than it currently owes to Plaintiff. There is no cap to the overall civil penalty that may be assessed per violation, so HHS can wield its enforcement power to great effect when a debtor party fails to pay.

Ultimately, HHS's enforcement powers under the NSA make sense of the mandatory payment language in the Act. For an administratively enforceable right to exist, it must be required in the relevant sections of the Act. *See id.* § 300gg-22(b)(2)(A) ("[A]ny non-Federal governmental plan . . . that fails to meet a provision of this part or part D . . . is subject to a civil money penalty under this subsection."). In context, then, the "shall pay" and "binding" language serves to create an obligation that HHS may enforce.

That this obligation exists here, however, does not translate into a private cause of action. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290 (citations omitted). When faced with a similar enforcement scheme, the Second Circuit found that delegated authority for HHS to impose penalties "clearly" reflected a congressional intent not to create a private cause of action. *See Meadows v. United Servs., Inc.*, 963 F.3d 240, 244 (2d Cir. 2020) (discussing the Health Insurance Portability and Accountability Act, or "HIPAA"). Here, the Court finds that congressional authorization for HHS to levy broad penalties, along with the clear language generally prohibiting judicial review, manifests the same intent to preclude a private remedy. *See Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) ("[The] right [to sue] should not be implied because the statute provides an administrative enforcement scheme designed to vindicate fully the rights of disabled passengers.").

In finding that the statutory text resolves this question, the Court ends its inquiry without reaching legislative intent or the views of the agency tasked with administering the NSA. Accordingly, this Court joins the substantial majority of courts who have found that the NSA does not contain an implied private right of action. *See, e.g.*, *Guardian Flight, LLC v. Health Care Serv. Corp.*, 140 F.4th 271 (5th Cir. 2025), *T.V. Seshan M.D., P.C. v. Blue Cross Blue Shield Ass'n*, No. 25-CV-1255 (CS), 2025 WL 3496382 (S.D.N.Y. Dec. 5, 2025); *E. Coast Advanced Plastic Surgery, LLC v. Cigna Health & Life Ins. Co.*, 25-CV-1686 (PAE), 2025 WL 2371537 (S.D.N.Y. Aug. 14, 2025), *appeal filed*, No. 25-2204 (2d Cir. Sept. 12, 2025); *Jeffrey Farkas, M.D., LLC v. Horizon Blue Cross Blue Shield of New Jersey*, 790 F. Supp. 3d 129 (E.D.N.Y. 2025); *Mitchell F. Reiter MD PC v. Horizon Blue Cross Blue Shield of New Jersey*, No. 25-CV-12526 (WJM), 2025 WL 3514300 (D.N.J. Dec. 8, 2025).

Although the Court is sympathetic to Plaintiff's lack of a more immediate remedy, "it is not the province of the courts to rewrite a statute for policy reasons, for only the Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing policy interests." *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 796 F. Supp. 3d 1, 14 (S.D.N.Y. 2025), *appeal filed*, No. 25-2150 (2d Cir. Sept. 5, 2025) (quoting *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1238 (D.C. Cir. 2003)) (cleaned up). As such, the Court instead applies the plain text of the statute and finds that no private right exists here.

## II.    There Is No Action to Confirm IDR Awards Under the FAA

For many of the reasons outlined above, federal courts also may not enforce IDR awards under Section 9 of the FAA. That IDR awards are "binding" does not mean that Congress contemplated judicial review to confirm these awards. Indeed, the plain language of the statute,

10

as discussed above, makes clear that judicial review is limited only to vacating IDR awards. An action to confirm an IDR award is not mentioned in the statute.

Three further reasons demonstrate that IDR awards are not enforceable under the FAA. At the most basic level, Congress chose not to incorporate the word "arbitration" into the NSA. Neither "arbitrate" nor "arbitration" appears in the statute, even though Congress contemplated IDR as a procedure analogous to arbitration. *See, e.g.*, H.R. Rep. No. 116-615, pt 1., at 56–57 (2020) (discussing the IDR process as "'baseball-style arbitration'" with an "arbitrator"). In a comparable statutory scheme, Congress made a different choice. The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") permits parties in a dispute to elect "binding arbitration" upon failure of a 90-day negotiation period. *See* 7 U.S.C. § 136a(c)(1)(F)(iii). Unlike the NSA, FIFRA explicitly refers to its dispute resolution mechanism as "arbitration" and incorporates the procedures and rules of the American Arbitration Association, enmeshing its dispute resolution with the broader arbitral mechanism of the FAA. *See id.*; *SRM Chem. Co. v. Fed. Mediation & Concilliation Serv.*, 355 F. Supp. 2d 373, 375 (D.D.C. 2005). Courts have interpreted arbitral awards under that statute accordingly, largely making them enforceable under the FAA. *See, e.g.*, *Non-Dietary Exposure Task Force v. Tagros Chems. India, Ltd.*, 309 F.R.D. 66, 68 (D.D.C. 2015); *Spray Drift Task Force v. Burlington Bio-Med. Corp.*, 429 F. Supp. 2d 49, 50 (D.D.C. 2006); *Cheminova A/S v. Griffin, LLC*, 182 F. Supp. 2d 68, 73 (D.D.C. 2002). In contrast, Congress's decision to create "independent dispute resolution" in the NSA reflects a choice to distance the IDR mechanism from arbitration. *See* 42 U.S.C. § 300gg-111(c)(2)(A). By distinguishing IDR from arbitration, the Court gives meaning to this choice. *See Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 534 (S.D.N.Y. 2024) ("Congress' word choice must be

11

considered intentional." (citing *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019))).

Second, there is a fundamental incompatibility between IDR, a unilateral right created by federal statute, and traditional arbitration, which stems from contract. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) ("The FAA reflects the fundamental principle that arbitration is a matter of contract."). Section 9 of the FAA provides, in part:

> If the parties *in their agreement have agreed* that a judgment of the court shall be entered upon the award made pursuant to the arbitration, . . . then . . . any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9 (emphasis added). As this language makes clear, "an [arbitration] award has legal force only because the parties have elsewhere promised to be bound by it." *Trs. of N.Y. State Nurses Assoc. Pension Plan v. White Oak Global Advisors, LLC*, 102 F.4th 572, 596 (2d Cir. 2024). The presumption of a written contract appears throughout the FAA. *See, e.g.*, 9 U.S.C § 2 (governing the validity of "an agreement in writing to submit to arbitration"); *id.* § 4 (governing the "failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration"); *see also Blue Cross Blue Shield Ass'n*, 2025 WL 3496382, at *5 ("From this language, it is clear that § 9, like the FAA as a whole, contemplates a written arbitration agreement between the parties."). This presumption is further underscored by the Supreme Court's recent decision in *Badgerow v. Walters*, which relies on the fact that arbitration awards are based in contract law, and thus have a home in state court, to limit federal question jurisdiction under Section 9. 142 S. Ct. at 1321–22. In this way, Section 9 is about holding the parties to their prior agreement. "[B]inding" IDR, on the other hand, is a unilateral right that either party may exercise under the appropriate conditions. 42 U.S.C. § 300gg-111(c)(1)(B) ("In the case of open negotiations . . .

that do not result in a determination of an amount of payment for such item or service . . ., the provider or facility (as applicable) or group health plan or health insurance issuer . . . that was party to such negotiations may . . . initiate the independent dispute resolution process . . . .”). As set out in the statute, IDR arises in the absence of any agreement between the parties, both in negotiations about the service at issue and in the prior step of lacking an in-network contract covering cost sharing more broadly. The fundamental basis on which Section 9 rests, then, is wholly absent from the NSA, which makes clear that IDR awards are enforceable only to the extent and in the manner that the statute has dictated.

Third, because of these differences, it makes sense that Congress saw fit to *explicitly* incorporate certain portions of the FAA into the NSA. *See id.* § 300gg-111(c)(5)(E)(i)(II) (incorporating 9 U.S.C. § 10(a)(1)–(4)). The explicit incorporation of Section 10 of the FAA suggests, in turn, that Congress consciously declined to incorporate Section 9. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up) (“Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.”). Elsewhere, as the Fifth Circuit noted, Congress has explicitly incorporated Section 9, even where it also incorporated Section 10. *Guardian Flight*, 140 F.4th at 276 (citing 5 U.S.C. § 580(c)). It would make little sense to omit Section 9, which incorporates Sections 10 and 11 by reference, and incorporate Section 10 when the intent is that they should both be incorporated. *See* 9 U.S.C. § 9 (“[T]hereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.”). These factors demonstrate that Congress did not intend for “binding” IDR awards to be confirmed, and thus made enforceable, under the FAA.

13

Plaintiff disputes this point, arguing that Congress only explicitly incorporated Section 10—and not Section 9—because traditional arbitration has no "force and effect until converted to a judicial order," whereas IDR awards are "binding" as soon as they are issued. MCA at 9–10. The Court rejects this argument. As Defendant notes, that IDR awards are meant to be "binding" does not distinguish them from arbitration awards. *See* Opp. to MCA at 13–14. In fact, many arbitration awards are rendered pursuant to a contract that states they will be "binding." *See, e.g.*, *Seneca Nation of Indians v. New York*, 988 F.3d 618, 622–23 (2d Cir. 2021) ("The Compact specifies that the arbitral award would be 'final, binding and non-appealable.'"); *Kallen v. Dist. 1199, Nat. Union of Hosp. & Health Care Emp., RWDSU, AFL-CIO*, 574 F.2d 723, 726 (2d Cir. 1978) ("[T]he collective bargaining agreement . . . provides[] that 'the award of an arbitrator hereunder shall be final, conclusive and binding . . . .'"). Plaintiff offers no basis for the Court to find that arbitral and IDR awards have different legal effect when issued, citing only to inapposite case law about the standard that courts must follow on a motion under Section 9 of the FAA. *See* ECF No. 17 ("Reply") at 4–5. Accordingly, the Court likewise rejects Plaintiff's request to confirm its IDR award.

## III.    Arguments About Proper Party Are Moot

Lastly, Defendant argues that Plaintiff has improperly sued "Aetna, Inc.," instead of "Aetna Life Insurance Company," and that the Court should dismiss Plaintiff's petition on that basis. Opp. to MCA at 6–7. Because the Court has already determined that dismissal is warranted here, it declines to consider Defendant's arguments about proper party.

**CONCLUSION**

For the foregoing reasons, the Court dismisses Plaintiff's petition to confirm the IDR

award under the NSA and the FAA. The Clerk of Court is respectfully directed to terminate ECF

No. 13 and close the case.

Dated:  March 30, 2026
        White Plains, New York

                                SO ORDERED.

                                _Jessica Clarke_____

                                JESSICA G. L. CLARKE
                                United States District Judge